**AFFIRM; Opinion Filed February 27, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-19-00270-CR**

**JOSE ALEX JUAREZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 265th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1776766-R**

# MEMORANDUM OPINION

Before Justices Partida-Kipness, Nowell, and Evans
Opinion by Justice Nowell

A jury convicted appellant of murder and sentenced him to 80 years' incarceration. In two issues, appellant argues the evidence is insufficient to support his conviction, and the trial court erred by overruling his objection to testimony at trial. We affirm the trial court's judgment.

### A. Sufficiency of the Evidence

In his first issue, appellant argues the evidence is insufficient to support his murder conviction. We review a challenge to the sufficiency of the evidence on a criminal offense for which the State has the burden of proof under the single sufficiency standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Acosta v. State*, 429 S.W.3d 621, 624–25 (Tex. Crim. App. 2014). Under this standard, the relevant question is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2011). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Therefore, in analyzing legal sufficiency, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Id.* When the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Id.* Direct and circumstantial evidence are treated equally: circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Id.*

As applicable in this case, a person commits murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE §19.02(b)(1)-(2).

The facts underlying appellant's conviction involve multiple locations in Dallas County.

### 1. *Mission Hills Lane*

On November 19, 2017, Ashley Sakawye lived with her son and other family members on Mission Hills Lane. Appellant is the father of her son. At approximately 2:00 p.m., appellant called Sakawye and asked to see their son. She testified: "But I could tell by the way he was talking that he wasn't doing okay, so I told him, no, that he couldn't see him today." Appellant became angry and went to Sakawye's house; Sakawye reiterated he could not see their son that day. After he left, appellant called Sakawye and threatened to "come kill me and my family." She continued: "he started telling me he was going to shoot my sister's house." Appellant texted a

picture of two guns, a rifle and smaller pistol, in his lap while he was in his car. Sakawye called the police.

Before the police arrived, appellant returned to Sakawye's house, exited his silver Nissan Murano, and racked his gun. Sakawye described the gun as "big," "long," and "the rifle one." Appellant banged on the front door, but, when no one answered, he left again. Officer Asa Lueng with the Dallas Police Department arrived at Sakawye's house in response to a call about a suspect with an AK-47. Sakawye was "pretty frantic," "very shaken, very scared." Because appellant was calling Sakawye repeatedly, she gave her phone to Lueng. Appellant told Lueng "he had a .9 [sic] millimeter and an AK." He also made "vague threats, stating that he didn't care if police was [sic] at her house and that he would die in a shootout with us."

Appellant also threatened Sakawye's brother-in-law, Jacob Garcia, and sent the following text messages to Jacob on November 19:

| Time | Message[1] |
|---|---|
| 2:32:05 p.m. | Tell cops I'll tell em I did it too |
| 2:32:35 p.m. | I got y'all |
| 2:33:30 p.m. | Whoever she fucking with the right one |
| 4:36:15 p.m. | Tell em to get ready I'm giving y'all heads up nigga |
| 4:46:14 p.m. | Ima have some fun nigga y'all get ready tell tha laws nigga |
| 4:46:30 p.m. | 5416 black hawk<br>Dallas tx. 75212 |

The police concluded Sakawye and anyone related to her could be in danger.

---

[1] Typographical and spelling errors are original to the text messages.

The police attempted to locate appellant at the house where he lived with his cousin, Frank Juarez,[2] and other family members on Black Hawk Street. Although appellant was not at the house, the police spoke to other people. Detective Derick Chaney testified at trial that the police speaking to people at the Black Hawk house "led to the disturbance between Frank and [appellant]." The police eventually concluded Frank was appellant's intended target.

*2. Mexicana Street*

Two men who lived on Mexicana Street heard gunshots on November 19 at approximately 5:23 p.m. Jorge Hernandez testified that when he arrived home on November 19, a silver Nissan Murano was stopped in front of his house. Mexicana is a dead-end road, and the Nissan was facing away from the dead end. As Hernandez opened the door to his house, "that's when the shooting occurred." Afterward, the Nissan drove away quickly. Hernandez identified appellant's Nissan Murano as the vehicle he saw.

The shots were fired at the gray brick house where Frank's girlfriend lived. Records showed appellant's cell phone was near Mexicana Street at the time of the shooting. Appellant sent the following text messages on November 19:

| Time | Recipient | Message[3] |
|------|-----------|---------|
| 4:48:16 p.m. | Irma Juarez[4] | U tell her she fucked up Ima do suicide by cop I got her |
| 4:58:22 p.m. | Frank Juarez | Ur girl gonna get it too bitch |
| 4:59:02 p.m. | Frank Juarez | Ur dad mom sis |
| 4:59:12 p.m. | Frank Juarez | Everyone bitch |
| 5:02:18 p.m. | Frank Juarez | Ima show u |

[2] Because Frank Juarez and appellant have the same last name, we will refer to Frank by his first name.

[3] Typographical and spelling errors are original to the text messages.

[4] Irma Juarez is appellant's aunt.

–4–

| 5:02:40 p.m. | Frank Juarez | Ima take someone wit me |
|---|---|---|
| 5:02:54 p.m. | Frank Juarez | I got y'all |
| 5:15:30 p.m. | Geo[5] | I know where u live at nigga |
| 5:15:38 p.m. | Geo | Stay out of it nigga |
| 5:15:54 p.m. | Geo | Grey brick house |
| 5:22:27 p.m. | Geo | I know U stay at a dead end nigga<br>don't play wit me |

Bullets found during the investigation at the Mexicana location were of the same caliber as fired cartridge casings found inside appellant's Nissan Murano.

### 3. *Chalk Hill Road*

Rene Martinez was asleep at his grandmother's house located on Chalk Hill Road on November 19 at about 6:30 p.m. He awakened when he heard three or four gunshots, which became progressively louder. He looked out the window and saw Frank with another person; Frank lived nearby and often visited the house on Chalk Hill Road. Someone in the house called Rene's grandmother, Beatrice Martinez, and the police. Beatrice received a phone call and the caller told her: "hey, Nana, Joe shot your brother, Joe shot your brother." Beatrice returned home and found her brother, Miguel "Michael" Martinez, had been shot. He died shortly thereafter.

Appellant's cell phone records showed he was in the vicinity of the Chalk Hill Road house at 6:31 p.m. After Miguel Martinez was shot, at 6:46 p.m., Irma Juarez, appellant's aunt, texted him: "Please calm down mijo….please. stop n think things out pleas[e]."

April Kendrick, a firearms supervisor in the firearm and tool mark section of the Southwestern Institute of Forensic Sciences, concluded bullets recovered from the murder scene on Chalk Hill Road and from a location on Mexicana Street were fired from the same gun. She

---

[5] No additional information about Geo's identity is provided in the record.

testified several guns could have fired the rounds, including an AK-47. Detective Chaney also concluded the shots fired at the Mexicana and Chalk Hill addresses were from the same weapons: one an AK-47 and the other a 9 millimeter.

### 4. *After Miguel Martinez's Death*

At approximately 7:00 p.m. on November 19, police traced a "ping" from appellant's cell phone to appellant's friend's house in Irving. The ping was coming from a "very secluded area." An officer went to the secluded location, but did not see the Nissan Murano. The officer did see another vehicle leave the area; he followed that vehicle to a gas station where appellant exited the passenger side of the vehicle. Appellant, who identified himself to officers as Jose Juarez, did not have any weapons on his person. No weapons associated with this case were found; however, Chaney testified the "two types of firearms that's [sic] displayed in the pictures [sent by appellant via text] are similar - - are the same type that's - - that shoot the - - the ammo that was found at the locations." Additionally, appellant had gunshot residue on his hands.

Officers found appellant's Nissan Murano hidden on the secluded property; the vehicle could not be seen from the street. The back window of the SUV was broken, and evidence found inside the Nissan was consistent with a person shooting a firearm while inside the vehicle.

### 5. *Conclusion*

The evidence shows appellant was driving his silver Nissan Murano on November 19. He was angry and sending threatening messages to multiple people. He possessed two firearms he threatened to use. Appellant threatened Frank's family, including his girlfriend, and provided a description of the house where his girlfriend lived. Shortly thereafter, a shooting occurred at that house and Jorge Hernandez identified appellant's SUV as the vehicle he saw. Bullets found at the Mexicana location were of the same caliber as fired cartridge casings found inside appellant's Nissan Murano, and cell phone records showed appellant was near Mexicana Street at the time of

the shooting. From the evidence, the jury could have reasonably concluded appellant carried out his threats and fired the shots at Frank's girlfriend's house on Mexicana Street.

The jury also could have reasonably concluded that, having not found Frank at Mexicana Street, appellant moved on to another place Frank was likely to be: Chalk Hill Road. Frank was at Beatrice Martinez's house at Chalk Hill Road, and appellant's cell phone records show appellant was near Chalk Hill Road one minute after Miguel Martinez was shot. Beatrice testified she received a phone call stating, "Joe shot your brother, Joe shot your brother." Evidence showed appellant was also called "Joe." Although no weapons were located, Chaney testified the "two types of firearms that's [sic] displayed in the pictures [sent by appellant via text] are similar - - are the same type that's - - that shoot the - - the ammo that was found at the locations." Likewise, April Kendrick concluded bullets recovered from the murder scene on Chalk Hill Road and from a location on Mexicana Street were fired from the same gun. Appellant, who had gunshot residue on his hands, then hid his vehicle.

Viewing the evidence in the light most favorable to the verdict and accounting for the jury's duty to draw reasonable inference from basic facts to ultimate facts, we conclude any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. We overrule appellant's first issue.

### B. Hearsay Objection to Testimony

In his second issue, appellant asserts the trial court erred by overruling his objection to testimony given by Detective Chaney. The State argues the testimony was not hearsay and, even if it was, appellant was not harmed. Chaney testified he concluded Frank was the intended target of the murder based on his investigation. When asked to "walk the jury through how you got to those conclusions," Chaney explained the investigation was complex. He testified:

I had to work forward and move backwards to kind of get the events of what lead to this happening. . . . I got called in later, after the murder in which I went to Irving.

After going to Irving, after learning that the car was important to my investigation, towing the car, I did go back to the headquarters. I did start interviewing witnesses, individuals that was [sic] involved in it. That led - - that led me to that [sic] the defendant was responsible for the victim's death.

Appellant's counsel objected on the basis of hearsay, and the trial court overruled her objection. Chaney continued testifying about his investigation.

In his brief, appellant argues "Chaney testified to the statements made to him by many different people during the course of his investigation. Although couched in terms of things he learned during his investigation, these were out of court statements which were offered for the truth of the matter asserted," and the State did not identify an exception to the hearsay rule.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court abuses its discretion only when its decision to admit or exclude the evidence lies outside the zone of reasonable disagreement. *Id.*; *see also De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). We will uphold a trial court's evidentiary ruling if it was correct on any theory of law applicable to the case. *See De La Paz*, 279 S.W.3d at 344.

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is generally not admissible. TEX. R. EVID. 802. However, police officers and police detectives may testify to information that might otherwise be considered hearsay in order to explain the course of an investigation and how the defendant became a suspect. *Smith v. State*, No. 05-18-00491-CR, 2019 WL 1615353, at *8 (Tex. App.—Dallas Apr. 15, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995); *Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.)). "An officer's testimony is not hearsay

–8–

when it is admitted, not for the truth, but to establish the course of events and circumstances leading to the arrest." *Id.* (quoting *Thorton v. State*, 994 S.W.2d 845, 854 (Tex. App.—Fort Worth 1999, pet. ref'd)). *See also Poindexter v. State*, 153 S.W.3d 402, 408 n.21 (Tex. Crim. App. 2005) ("testimony by an officer that he went to a certain place or performed a certain act in response to generalized 'information received' is normally not considered hearsay because the witness should be allowed to give some explanation of his behavior"), *abrogated on other grounds by Robinson v. State*, 466 S.W.3d 166, 173 n.32 (Tex. Crim. App. 2015); *Schaffer v. State*, 777 S.W.2d 111, 114–15 (Tex. Crim. App. 1989) ("[A]n arresting officer should not be put in the false position of seeming just to have happened upon the scene, he should be allowed some explanation of his presence and conduct."). However, the testifying officer is not permitted to relate "historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the grounds that [he] was entitled to tell the jury the information upon which [he] acted." *Id.* (citing *Schaffer*, 777 S.W.2d at 114–15). The critical question is whether there is an inescapable conclusion that the evidence is being offered to prove the truth of statements made outside the courtroom. *Id.* (citing *Schaffer*, 777 S.W.2d at 114–15).

Appellant concedes Chaney testified about statements made to him by others during the course of his investigation. Acting within its discretion, the trial court could have concluded these are the types of statements an officer is permitted to testify to and are not hearsay; Chaney did not relate "historical aspects of the case, replete with hearsay statements in the form of complaints and reports." *Id.* Because the trial court could have concluded Chaney's testimony was not hearsay, we will not conclude it abused its discretion by overruling appellant's objection to the testimony. We overrule appellant's second issue.

## C. Conclusion

We affirm the trial court's judgment.

/Erin A. Nowell/
ERIN A. NOWELL
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
190270F.U05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

JOSE ALEX JUAREZ, Appellant

No. 05-19-00270-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 265th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1776766-R.
Opinion delivered by Justice Nowell.
Justices Partida-Kipness and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 27th day of February, 2020.